IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 13, 2017 Session

**STATE OF TENNESSEE v. JERRY DIXON**

**Appeal from the Criminal Court for Sumner County**
**No. 584-2012     Louis W. Oliver III, Judge**

_____

**No. M2016-01517-CCA-R3-CD**

_____

The Defendant, Jerry Dixon, was convicted by a Sumner County Criminal Court jury of reckless endangerment, a Class A misdemeanor, for which he received a sentence of eleven months, twenty-nine days, with sixty days to be served in jail, 180 days to be served on house arrest, and the balance to be served on probation. *See* T.C.A. § 39-13-103 (2014). On appeal, he contends that the evidence is insufficient to support his conviction and that the trial court erred in excluding evidence of a witness's prior inconsistent statement. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT L. HOLLOWAY, JR., JJ., joined.

Peter J. Strainse (at trial and on appeal), Nashville, Tennessee, and William L. Moore, Jr. (at trial), Gallatin, Tennessee, for the appellant, Jerry Dixon.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Lawrence Ray Whitley, District Attorney General; C. Ronald Blanton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant and the victim, Ricky Troutt, were former partners in several business ventures. Their business dealings ended in litigation, and at the time of the events relevant to this case, their relationship was strained to the extent that they did not speak to each other. In early 2012, the Defendant and Eli Cornell engaged in a scheme to play a practical joke on the victim, whereby Mr. Cornell posed as a wealthy individual who wished to have the victim build a house for him. The Defendant's goal was to embarrass the victim, who was in the construction industry.

The present case relates to a physical altercation between the victim and the Defendant that occurred at Longhorn Steakhouse on February 21, 2012, and in which the victim received significant cuts to his face, neck, and right arm. The Defendant was charged with attempted second degree murder and was convicted of the lesser included offense of misdemeanor reckless endangerment.

At the trial, a 9-1-1 call was introduced through a dispatcher. In the call, a person who identified herself as Paige Brown reported that two men were involved in a fight at Longhorn Steakhouse. She said that both men had cuts to their face, that there was a lot of blood, and that a man she knew as Rick Troutt had a man whose name she did not know pinned down. She said initially that the unknown man had a knife but reported later in the call that the restaurant's cook had taken the knife from the unknown man.

Sumner County Sheriff's Deputy Chris Vines, a former Gallatin Police officer, responded to the scene. He testified that he found the Defendant lying on the restaurant's foyer floor with the victim kneeling next to and holding down the Defendant. Deputy Vines said that the Defendant's forehead was bleeding badly and that the victim's neck was "sheeting" or spurting blood. Deputy Vines said the Defendant was covered in blood. Deputy Vines said blood was on the walls, windows, and glass doors of the foyer. He said a knife was inside the restaurant near an umbrella stand. He said the Defendant's glasses, the victim's glasses, and a charm from the Defendant's necklace were on the foyer floor. Deputy Vines was unaware of Officers Kent or Shockley having been told by an elderly, male restaurant patron that the victim had been the aggressor.

William Elijah Cornell testified that he met the Defendant and Roger Harrison six to eight weeks before the February 21, 2012 incident and that he had met the victim once. Mr. Cornell said that he and the Defendant developed a friendship and that the Defendant told Mr. Cornell about the Defendant's disdain for the victim due to their past business dealings. Mr. Cornell said the Defendant wanted to play a practical joke on the victim to make the victim look foolish in front of the victim's bankers. Mr. Cornell said the Defendant asked Mr. Cornell to talk to the victim about having the victim build Mr. Cornell a large home in "the Plantation." Mr. Cornell said the plan was to raise the victim's hopes about building the home and then to tell the victim that Mr. Cornell was not interested because the Defendant had said the victim was "an A-hole." Mr. Cornell explained that the victim would have to explain to his bankers that he did not need to borrow money for the project. Mr. Cornell said he went along with the scheme because he wanted the Defendant to help him finance a trucking company.

-2-

Mr. Cornell testified that, in furtherance of the scheme, he met with the victim and posed as a wealthy, disbarred attorney from Maine and discussed having a house built with money he had obtained fraudulently. Mr. Cornell recorded their conversation. He later met with the Defendant and Mr. Harrison and gave the recording to the Defendant, who was pleased with its contents.

Mr. Cornell testified that on February 21, 2012, he had drinks with the Defendant at Longhorn Steakhouse. Mr. Cornell said that the Defendant wanted him to call the victim but that Mr. Cornell did not want to because he had to be up early the next day. Mr. Cornell thought, however, that he had called the victim as he and the Defendant sat outside in Mr. Cornell's car. Mr. Cornell said he sensed that the victim knew he was the subject of a joke. Mr. Cornell said that he left the premises, that he left the Defendant there, and that he assumed the Defendant returned to the restaurant. Mr. Cornell said that he received a call from the victim, that the victim asked his name and other questions, and that Mr. Cornell called the Defendant and told him the victim sensed he was the subject of a joke. Mr. Cornell said the Defendant stated, "[H]e's right here with me." Mr. Cornell heard the Defendant say, "You've been had, buddy," and heard the victim say, "[N]o, you've been had, buddy." Mr. Cornell tried to call the Defendant later but did not receive an answer. Mr. Cornell said that on his way home, he saw police and emergency vehicles at Longhorn Steakhouse but that he did not stop because he had consumed three beers and did not want to be charged with driving under the influence. He said that the police left a message for him during the night and that he contacted them the next day.

Mr. Cornell did not recall telling Investigator Messler that Mr. Harrison had instigated Mr. Cornell's contacting the victim about building a house. Mr. Cornell said, however, that if he had said this when he was interviewed on February 24, 2012, his memory at the time of the interview would be more accurate than his memory at the time of the trial. He acknowledged that a transcript of his interview reflected that Mr. Harrison had instigated the practical joke and that Mr. Cornell had characterized the Defendant as "standoffish."

Retired Gallatin Police Officer Danny Deyhle identified photographs he took of the scene, the victim, and the Defendant, and the photographs were received as exhibits. Some of the photographs depicted a ring on the Defendant's left hand, a sutured laceration several inches long on the victim's right arm, and four cuts on the side of the victim's face. Officer Deyhle said he collected a leather coat, a cell phone, eyeglasses, and a pocketknife from the scene. He said that to the best of his knowledge, samples of blood spatter he collected from the scene were not submitted to the Tennessee Bureau of Investigation (TBI) for analysis. He said that no analysis was necessary because two

known individuals were involved in the altercation and that analysis was used to identify unknown individuals.

Candice Pewitt testified that she was the Longhorn Steakhouse bartender at the time of the altercation. She knew the Defendant as a regular customer. She said that on February 21, 2012, the Defendant and a friend of the Defendant's arrived shortly after 4:00 p.m. She said that the Defendant's friend drank several beers and that the Defendant drank a double margarita, a second margarita, and part of a third. She said that a note she wrote on the back of a receipt for the Defendant's purchases on the date of the incident indicated the Defendant had been at the restaurant from 4:15 to 7:45 p.m. She did not think the Defendant was intoxicated.

Richard Miller, M.D., and expert in trauma surgery, testified that on February 21, 2012, the victim was transported by a Life Flight helicopter to Vanderbilt Medical Center and that he operated on the victim due to a life-threatening injury. Dr. Miller said the victim had four major slash wounds to his face, neck, and arm. Regarding a fifteen-centimeter right-side facial cut, Dr. Miller said that in his opinion, the cut was first inflicted near the victim's ear and extended toward the victim's mouth. Dr. Miller said the victim had a smaller, two centimeter cut on the right side of the face, as well. Regarding an eleven-centimeter cut on the right side of the victim's neck, Dr. Miller stated his opinion that the cut was deeper in the front than the back, indicating that the cut began in front and traveled back. He said the victim also had a six-centimeter arm cut and a two-centimeter facial cut.

The victim, a self-employed home builder, testified that he had known the Defendant for about thirty years and that, at one time, they had been friends and business partners. They began dissolving their business partnership in August 2006, and litigation pertaining to the dissolution concluded in approximately 2008. The victim said that the dissolution had been acrimonious and that he and the Defendant had not spoken since August 2006.

The victim testified that he became acquainted with Eli Cornell, whom he knew as "Will," when Mr. Cornell called him about building a home. The victim said Mr. Cornell claimed he was moving from "Boston or something." The victim said that he met with Mr. Cornell, that they looked at properties where a house might be built, and that Mr. Cornell called him later about seeing additional properties.

Relative to the events of February 21, 2012, the victim testified that he and his wife went to Longhorn Steakhouse around 7:00 p.m. He said that because the restaurant was crowded, they went into the bar, where he saw the Defendant. The victim said his

wife offered to trade seats with him in order to avoid his having to look at the Defendant during the meal. He said that he had seen the Defendant talking to another man at the bar and that he saw them leaving the bar and walking toward the restaurant's door. The victim said he recognized Mr. Cornell as the person with whom he had spoken about building a house. The victim said that his cell phone rang a few minutes after the Defendant and Mr. Cornell left, that his phone displayed the contact name "Will, new house." The victim said he returned the call and went to the restaurant's window. He saw the Defendant and Mr. Cornell in a car in the parking lot. The victim said Mr. Cornell stated he wanted to schedule a meeting when Mr. Cornell would be back in town. The victim said he saw the Defendant and Mr. Cornell laughing and talking. The victim said he had realized that Mr. Cornell was not the person he had represented himself to be.

The victim testified that he talked with his wife for a few minutes, then went to the restroom. He said the Defendant was at the urinal. The victim said the Defendant never knew the victim was in the restroom. The victim said he went outside, called Mr. Cornell, and asked Mr. Cornell his last name. The victim said Mr. Cornell identified himself as Mr. Connall or Mr. Canal. The victim said Mr. Cornell stated that a realtor told Mr. Cornell that the victim had an issue with a past business partner. The victim said he stated that he found this unusual because the victim was in discussions with a family member of the realtor about building a house. The victim said he returned to the restaurant, where his wife tried to make notes of what she overheard the Defendant saying. The victim heard the Defendant say, "[J]ust tell him that. He'll believe that. Just get him up there. You know, you can tell him that right there. Just get him up there Thursday." The victim said the Defendant had been drinking and was boisterous.

The victim testified that he walked to the bar, tapped the Defendant on the shoulder, and said, "[S]cam's up." The victim said the Defendant stated, "[B]y God, I've been scamming you," and "[Y]ou're not coming up on me in here." The victim said that the Defendant "body checked" him and that the victim said, "[N]ot in here. If you want me to beat your a--, we'll have to go outside." The victim said the Defendant stood up and followed him out of the bar. The victim said they were six to eight feet from the hostess stand as they walked out. The victim said that as he went through the double doors at the front of the restaurant, he felt a sting that felt like a razor cut, followed by "a massive amount of pain." He said he turned around and hit the Defendant above the left eye as hard as he could with his right hand. The victim said he did not hit the Defendant until after the Defendant cut him. The victim said that when he hit the Defendant, the Defendant hit the floor and that the victim "jumped" on top of the Defendant and continued hitting him. The victim said the Defendant was cutting and stabbing him with the Defendant's left hand. The victim saw blood shooting from his body. The victim said that he hit the Defendant until he felt like he was going to pass out and that

eventually, he was able to hold down the Defendant's left hand with the victim's right hand. The victim was unaware of who removed the knife from the Defendant's hand. The victim did not recall a cook's saying the victim was the aggressor. The victim said that he was taken by helicopter to Vanderbilt Medical Center and that he still had scars and numbness in his ear and on the side of his face.

The victim testified that he did not drink alcohol. He said his intent in going outside had been to engage in a fist fight, not a knife fight. He acknowledged that he had filed a lawsuit against the Defendant and Longhorn Steakhouse related to his injuries. The victim said that he felt the neck cut first, that it occurred as he went through the doors, that the cut had gone from front to back, and that it was deeper in front. He said that the cut to his face was sustained after he was through the doors and in the foyer.

The victim testified that he had not finished eating when he became aware the Defendant and Mr. Cornell were outside laughing, likely at his expense. He acknowledged that he could have requested his check, asked for his food to be packaged to go, and ignored any future calls from Mr. Cornell posing as a prospective home buyer. The victim said that instead, he sat with his wife and continued to eat dinner.

The victim acknowledged that he had encountered the Defendant at a hospital on February 17, 2012 without incident. The victim said that he and a companion of the Defendant had spoken to each other in passing.

The victim denied that, during the previous litigation between himself and the Defendant relative to their business dealings, he had told Roger Harrison that the Defendant "had a butt whipping coming to him." The victim agreed that signs stating "Ricky Troutt, contractor bankrupt" appeared and disappeared from his construction sites and that he strongly suspected the Defendant's involvement. Relative to gossip at a truck stop restaurant in which the Defendant had an ownership interest, the victim said he had heard, "I was [the Defendant's] main topic of interest."

The victim's wife testified that the victim had not spoken to the Defendant for years following the dissolution of their business partnership. She said that on February 21, 2012, she and the victim had dinner at Longhorn Steakhouse. She said that when she noticed the Defendant seated at the bar, she asked the victim to swap seats with her. She said the victim drank tea with his meal. She said she overheard the Defendant's companion say, "[D]on't get a DUI," or something similar. She said that as the Defendant's companion left, the victim recognized the man as "Will," the person who had called about having the victim build a house for him. She said that the Defendant left shortly after Will and that the victim went to the window and looked into the parking

-6-

lot. She said the victim returned to the table and received a cell phone call from "Will, new house" and did not answer. She said she urged the victim to return the call in order to determine what was happening in light of what they had just seen at the bar. She said the victim returned the call, went to the window, and returned to the table after the call. She said the victim went to the restroom, returned to the table and said the Defendant had been in the bathroom but had not seen him. She said that the victim did not know Will's last name and that he went outside to call Will to get the information. The victim's wife said the Defendant returned to the bar while the victim was outside. She overheard the Defendant on a cell phone call with a person she assumed had been the person sitting at the bar with the Defendant. She said the Defendant stated, "[I]f you're caught, tell him, 'you've been punked by Red.'" Other evidence showed that the Defendant's nickname was Red.

The victim's wife testified that the victim returned to the table and that she showed him the notes she made in her cell phone relative to the Defendant's conversation. She said the victim walked up to the Defendant, tapped the Defendant's shoulder, and said, "[S]cam's up." She said the Defendant turned, looked angry and had a red face, said, "I've been scamming you," and "body bumped" the victim. She said that the Defendant said, "[Y]ou're not going to walk up on me in here," and that the victim responded, "[W]ell, we'll take it outside."

The victim's wife testified that the victim walked toward the door with the Defendant walking quickly a couple of feet behind him. She said she paid the bill and started to leave. She saw the victim and the Defendant going into the foyer. She said she saw the Defendant's "shoulders and body go up . . . into" the victim's right side. She said that as she reached the foyer's glass doors, she saw the victim turn with his right arm up. She said the victim's face and neck were cut "wide open." She saw the victim hit the Defendant once, which knocked the Defendant to the ground. She said that the Defendant had a knife in his left hand and that the victim held the Defendant's left hand to the ground with the victim's right hand and the Defendant's body with the victim's left forearm to prevent the Defendant from continuing to stab the victim. When asked if anyone else was nearby, the victim's wife said that the restaurant's hostess was the only other person and that the hostess was behind her at the hostess stand. The victim's wife said that the victim struggled to hold down the Defendant's arm, that the victim was becoming weak from blood loss, and that the Defendant continued to try to stab the victim. She said a person she thought was a cook came from the back of the restaurant and took the knife from the Defendant.

Paige Brown testified that on February 21, 2012, she was a high school senior and that she worked at the time as a hostess at Longhorn Steakhouse. She knew the

Defendant and the victim as restaurant customers. She said the Defendant and a male companion sat at the bar that evening and that, due to the wait for dining room seating, the victim sat at a high-top bar table. She said the Defendant went outside to smoke, as was his custom when he was at the restaurant. She said the Defendant's companion went outside with the Defendant.

Ms. Brown testified that when she was in the dining room, she noticed the Defendant and the victim "chatting" at the bar. She was not alarmed by their talking and said they were not loud. She saw the victim walking out with the Defendant "a couple of steps behind him." She said that she could tell from their body language that they were heated and upset and that they walked in a "fury." She said that as the men were in the foyer, the victim stopped, turned around, and swung at the Defendant. She said the men started fighting, with "[n]either . . . getting any big hits in." She said that the Defendant ended up on the ground against the outside doors and that the victim was on top of the Defendant punching the Defendant as hard as he could. She said that the Defendant had a knife, that the victim held the Defendant down, and that "Seth" tried to kick the knife from the Defendant's hand and tried to step on the Defendant's hand to get him to release the knife. She said that eventually, "the knife got out of [the Defendant's] hand and we kicked it into the restaurant." Ms. Brown said she first saw blood when the victim turned to swing at the Defendant. She said she saw blood and then saw the victim swing at the Defendant.

Ms. Brown testified that witnessing the incident had been traumatic. She said she spoke and gave a handwritten statement to law enforcement officers that night at the scene and gave a video recorded statement at the police department a few days later. She acknowledged that she had been interviewed by a defense investigator and that she had testified at a preliminary hearing. She said her trial testimony was "as clear as I can possibly remember."

Ms. Brown was shown a transcript of the recorded statement she gave to the police a few days after the incident, and she acknowledged that she had said she had not seen blood on the victim's face when he turned around to punch the Defendant. She also acknowledged that she had said the victim punched the Defendant once, that the Defendant brought up his hand, and that she had not seen anything in the Defendant's hand. She acknowledged that she had said, "I'd say the third or fourth punch, I saw a whole bunch of blood." She agreed that she had not told the police investigator that she saw blood as soon as the victim turned around and that she had said she had not seen blood on the victim or a knife when the men went through the foyer doors. She acknowledged that when a police investigator asked if she agreed with a statement that

the Defendant made a furtive move toward the victim as they reached the foyer, she had said, "I don't think so."

Regarding her prior statement to a defense investigator, Ms. Brown recalled stating that when the Defendant walked past her, he had his left hand in his pants pocket and that when the men were in the foyer, she saw the victim suddenly and without provocation turn and punch the Defendant in the jaw with his right hand. She recalled stating that the Defendant and the victim exchanged a few blows while the Defendant had his left hand in his pocket, that the Defendant removed his hand after each man had thrown about three punches, and that the men continued to fight.

Regarding her prior testimony at the preliminary hearing, Ms. Brown recalled testifying that she saw the victim walk out with the Defendant close behind him, that the victim paused for a second and punched the Defendant's face with his right hand when they reached the foyer, that she did not see the Defendant do anything to the victim before the victim hit the Defendant, and that the Defendant had been walking with his left hand in his pocket. She agreed that she had testified previously that the Defendant was a regular customer and that his general practice was to walk with his left hand in his pocket. She also agreed she had testified that after the victim punched the Defendant's face, the men shuffled but neither made hits that caused injuries. She acknowledged she had testified that the Defendant's hand was still in his pocket when the victim threw the first punch. A transcript of her preliminary hearing testimony was received as an exhibit.

Seth Lazenby, a former Longhorn Steakhouse culinary professional, acknowledged prior convictions for felony forgery and misdemeanor theft. He testified that he recognized the Defendant as a regular bar customer but did not know his name. Mr. Lazenby said that on February 21, 2012, he was working in the kitchen when a manager ran in and said a "bad" fight was happening. He said that he and a cook went into the front of the restaurant and saw the fight in progress but did not see the beginning of the fight. He said that the Defendant was on the ground, that the victim was on top of the Defendant struggling to hold the Defendant down, and that the Defendant had a knife in one hand. Mr. Lazenby said the victim was unable to continue fighting. Mr. Lazenby said that the Defendant's arm that held the knife was moving and that Mr. Lazenby was afraid of being cut. Mr. Lazenby said he bent the Defendant's hand around an open door, stomped on the Defendant's hand until the Defendant released the knife, and slid the knife out of the Defendant's reach with Mr. Lazenby's foot. Mr. Lazenby said the victim was bleeding badly onto the Defendant. He agreed he told a police officer that an old man told him he had the "wrong person" before he stepped on the Defendant's hand. Mr. Lazenby said the man had stood in front of the hostess stand and had held the door open for patrons who left the restaurant.

Gallatin Police Sergeant Christian Booth testified that he interviewed the Defendant at the Sumner Regional Medical Center. Sergeant Booth said the Defendant had a small laceration above the left eye, which was swollen and red. Sergeant Booth said he confirmed with the Defendant and the nurses that the Defendant had not been given pain medication. Sergeant Booth said the Defendant was calm, logical, and coherent. Sergeant Booth said that he spoke with the Defendant for about an hour, that he recorded the interview, and that the Defendant stated the following: The Defendant arrived at Longhorn Steakhouse around 5:30 p.m. The Defendant stated, initially, that he had been alone, but after being confronted with a witness statement that he had been with someone, he said he had been with "Eli." The Defendant claimed that he knew Eli from having seen him in bars and that he did not have any contact information. The Defendant said that, while he sat at the bar, the victim approached and stated that if the Defendant would come outside, the victim would "whip his a--." The Defendant stated that he followed the victim and that they got into a fight in the foyer. The Defendant stated that he was hit a few times, that he was knocked to the ground, and that he cut the victim. Sergeant Booth testified that he recorded a second interview with the Defendant, which took place after the Defendant underwent a medical scan.

The recordings of Sergeant Booth's interviews with the Defendant were played for the jury. In the recordings, the Defendant stated that he and the victim had been business partners but were not on good terms because the victim had stolen money from the Defendant. He said that February 21, 2012, was the first time they had spoken. The Defendant stated that he had been alone but, when told by Sergeant Booth that witnesses said another man had been with him, the Defendant said "Eli" had been there earlier but that he did not know how to contact Eli. The Defendant said that although he had ordered a meal at the restaurant, he did not have the opportunity to eat it. He agreed he had consumed three to four margaritas but said that he would have been "okay to drive" if he had eaten. He said he had not been bothering anyone. He said that before he ordered his meal, he had drinks with and talked to Eli. The Defendant said they had walked outside to talk about the silver market. The Defendant said that after he ordered, the victim walked up and said he would "whip [the Defendant's] a--," that the Defendant followed the victim to the foyer, and that the victim turned and started hitting the Defendant. The Defendant said that he had "not really" expected the victim to hit him, that he had not thought a fight would occur, and that he thought the victim "was going to blow off a little steam." The Defendant was unsure if he already had his hand in his pocket and if he had his knife in his hand when the victim hit him. The Defendant thought he had not retrieved the knife before the victim hit him but was unsure. The Defendant said that he was left-handed and that the knife was in his left pocket. The Defendant did not know whether he was standing or on the ground when he retrieved the

-10-

knife. The Defendant said the victim "definitely" hit him first and repeatedly denied that he cut the victim before the victim hit him. The Defendant said that if witnesses stated he cut the victim first, that was untrue. The Defendant did not know why, if he and the victim had faced each other, that the victim had a cut on the back of the neck. He said he did not cut the back of the victim's neck but later said he did not know where he cut the victim. When asked if he had cut the victim's neck and the victim had turned and hit the Defendant, the Defendant said, "That's definitely not correct." The Defendant said he just tried to get the victim off him. The Defendant did not know how many times the victim hit him and stated he swung at the victim with a knife once or twice. The Defendant said he did not know how many times the victim hit him before the Defendant cut the victim, but he later said two to three times. The Defendant then said he swung the knife the first or second time the victim hit him. The Defendant then said the victim hit him "a time or two" or "two or three times" and knocked him against the wall, at which point the Defendant swung the knife. The Defendant said that he was not the aggressor and that he thought the victim was going to hurt him "bad."

Regarding data Sergeant Booth obtained from a search warrant he executed for the Defendant's cell phone, Sergeant Booth testified that the Defendant had several incoming calls to a specified telephone number on February 7, 14, 15, 17, 20, and 21, 2012. The Defendant also had outgoing calls to this number on February 14, 15, 20, and 21. The prosecutor did not ask Sergeant Booth if he determined the owner of the telephone number. On cross-examination, Sergeant Booth agreed that a conversation with the Defendant's stepdaughter "set [him] on the path of calling Roger Harrison" and that this had been how he determined Eli Cornell's telephone number.

Gallatin Police Detective James Kemp testified that he spoke with the Defendant at the hospital. Detective Kemp said that the Defendant appeared to have been "beat up," that the Defendant was coherent, and that the Defendant stated he "felt fine." Detective Kemp said the Defendant stated he had received pain medication. Detective Kemp stated that he recorded his interview with the Defendant, which was played for the jury. In the recording, the Defendant acknowledged he was friends with Roger Harrison. The Defendant said he met Eli "at one of those places drinking." The Defendant said Eli told the Defendant that Eli had spoken with the victim about the victim's building a house for Eli. The Defendant did not know where the house was to be built. The Defendant did not think he and Eli had spoken about the victim's building a house for Eli on the night of the incident. The Defendant stated that he and the victim had been in business together and that he caught the victim stealing. The Defendant stated he did not pull a knife until the victim hit him.

John Berwin testified as a defense witness that he was at Longhorn Steakhouse on February 21, 2012. He said he saw the victim and a woman enter the restaurant and go to a high table. He said the victim walked around the table two to three times and appeared "very agitated, maybe apprehensive. He was nervous." Mr. Berwin said that after four or five minutes, the victim walked to the Defendant, who was seated, and that Mr. Berwin heard the men talking for about ten seconds, although he could not hear what they said. Mr. Berwin heard someone say, "You owe me money," but he did not know who said it. Mr. Berwin said the victim and the Defendant talked a few more seconds. Mr. Berwin heard one of the men say, "[L]et's settle this outside," and Mr. Berwin saw the victim walk toward the door with the Defendant behind him. Mr. Berwin did not see a push, chest bump, or any contact between the Defendant and the victim when the Defendant stood. Mr. Berwin did not see the Defendant make an aggressive move toward the victim as the men walked out of the bar. Mr. Berwin lost sight of the men as the men reached the door, but he said he knew something was about to happen. Mr. Berwin heard the wall shake violently, and he called 9-1-1. Mr. Berwin said that about twenty seconds later, he walked to the front door. He said that he saw the Defendant on the ground with his back to the wall, that the victim "sitting on" the Defendant, and that "he" was covered in blood. Mr. Berwin said he stated, "[T]his guy started it," and pointed at the victim. Mr. Berwin said he formed this opinion based upon the victim's nervous demeanor when the victim entered the restaurant and the Defendant's sitting and eating in peace. Mr. Berwin thought the incident would not have occurred if the Defendant had not been confronted. Mr. Berwin said he was interviewed by the police that night.

The sixty-nine-year-old Defendant testified that, previously, he and the victim, who was eleven or twelve years younger, had been friends and had been in business together but that their endeavors ended in litigation and hard feelings. The Defendant agreed that they no longer had contact by about 2006. The Defendant said he met Eli Cornell in January 2012 when the Defendant and Roger Harrison were at Koi Grill. The Defendant said that at some point later, he, Mr. Harrison, and Mr. Cornell discussed playing a practical joke on the victim. The Defendant said that he had not intended for the victim to be harmed physically and that he was ashamed of what had happened. The Defendant agreed that Mr. Cornell began contacting the victim in early February 2012 and that the Defendant had telephone conversations with Mr. Cornell between February 14 and 21. The Defendant said that on February 21, he and Mr. Cornell met at Longhorn Steakhouse. The Defendant said that when he arrived around 4:30 p.m., he ordered a margarita and that after Mr. Cornell arrived, the men drank together at the bar. The Defendant said that around 6:00 or 6:30 p.m., he and Mr. Cornell went outside in order for Mr. Cornell to call the victim in furtherance of the practical joke. The Defendant said that the victim did not answer but that the victim called back quickly. The Defendant

-12-

said that he and Mr. Cornell laughed and joked about the call, that the Defendant returned to the restaurant, and that the Defendant thought Mr. Cornell returned to the restaurant and had another beer.

The Defendant testified that he had been unaware the victim was at the restaurant until the victim tapped him on the shoulder after about 7:00 p.m. The Defendant said he had been talking on his cell phone to Mr. Cornell, who told the Defendant that the victim knew about the joke, when the victim approached the Defendant. The Defendant said the victim stated, "[S]cam's up." The Defendant said he asked about what the victim was speaking. The Defendant said the victim responded, "You know what I'm talking about. Your little jig is up." The Defendant said he asked the victim why the victim stole money. The Defendant said the victim did not like that people in Westmoreland knew that the victim had stolen money. The Defendant stated that the victim said, "If you'll come outside, I'll whip your ass," and that the Defendant responded, "[O]kay, I'll be there." The Defendant said the victim had not said anything about "not in here." The Defendant said he followed two to three steps behind the victim toward the door.

The Defendant testified that at this point, he had probably consumed three margaritas and had ordered a fourth. He agreed he had ordered food. He said that he was left-handed and that he had been told he had a habit of walking with his left hand in his pocket. The Defendant said he had not thought they were going to have a fistfight outside. The Defendant said that when they were about halfway inside the foyer, the victim turned and hit him. The Defendant said the victim hit him a second time, while the Defendant was still standing, and broke the Defendant's glasses. The Defendant said he bled before the victim. The Defendant said that he was knocked to the ground with the second or third blow and that he took out his pocketknife about the same time and swung at the victim's head. The Defendant said he reached for the knife when the victim broke his glasses. The Defendant did not know how many times the victim hit him and said the victim continued to hit him as the Defendant swung the knife. The Defendant identified a photograph of his injuries, which was received as an exhibit but which has not been transmitted to this court with the appellate record. The Defendant denied that he had made a preemptive strike by cutting the victim as they entered the foyer. The Defendant said that although some people were able to open a pocketknife blade with one hand, he was not.

The Defendant testified that on February 17, 2012, he and Donald Graves had encountered the victim at a hospital in Gallatin. The Defendant said he had not spoken to or assaulted the victim. The Defendant thought Mr. Graves and the victim had spoken.

The Defendant acknowledged that he had not been forthcoming with the police about Mr. Cornell. He said that the police had not been forthcoming with him and that he had not known "how they might move things around." The Defendant said that he was embarrassed by the practical joke, that he had not attempted to kill the victim, and that he had acted in self-defense. The Defendant said the victim was much younger than he and that the Defendant was out of shape. The Defendant said he had thought the victim wanted to "blow off a little steam" in the parking lot. The Defendant regretted that he had followed the victim toward the door.

The Defendant agreed that both he and the victim had felt they "got the short end of the stick" in the litigation that dissolved their business partnerships. The Defendant agreed that if the victim's name were mentioned in the Westmoreland community, the Defendant would not have anything nice to say. When asked if the Defendant continued to be irritated over the years by the victim's theft, the Defendant said, "I hadn't forgot it, by no means."

The Defendant agreed that the victim had sued him and that the Defendant had filed a counterclaim against the victim and the victim's wife for $250,000 in damages.

After receiving the proof, the jury acquitted the Defendant of the charged offense of attempted second degree murder and found him guilty of the lesser included offense of misdemeanor reckless endangerment. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction because the State's proof failed to overcome the Defendant's self-defense theory and because the State failed to prove that anyone other than the victim was endangered by the Defendant's conduct. The State responds that the evidence is sufficient to support the conviction. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding

-14-

"the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (*quoting State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

As relevant to this appeal, reckless endangerment occurs when "[a] person . . . recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." *See* T.C.A. § 39-13-103(a) (Supp. 2011) (amended 2012, 2013).

> "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and justifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

*See id.* § 39-11-302(c) (2014).

The Defendant contends, first, that the jury's acquittal of the greater offenses of attempted second degree murder and attempted voluntary manslaughter indicate its acceptance of the Defendant's self-defense theory. He argues that because the jury credited his self-defense theory involving the authorized use of force, the evidence is, therefore, insufficient to support the reckless endangerment conviction.

Relative to self-defense:

> (b)(1) Notwithstanding § 39-17-1322 [relative to the use of a handgun in self-defense or defense of another], a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another

person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

(2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(1), (2)(A)-(C) (2010) (amended 2012, 2016, 2017). Once a defendant has raised sufficient facts to support a finding he acted in defense of self, "The state has the burden of proof to negate the defense; the burden is not upon the defendant to prove the defense exists." *State v. Belser*, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996) (citing T.C.A. § 39-11-201(a)(3)).

We disagree with the Defendant's argument that the jury's rejection of the greater offenses leads to the inevitable conclusion that the State failed to rebut the self-defense theory. The jury could have concluded that the State failed to prove the existence of one or more of the elements of attempted second degree murder and attempted voluntary manslaughter and, had it so concluded, would have returned not guilty verdicts on this basis. *See* T.C.A. §§ 39-12-101 (2014) (criminal attempt), 39-13-210 (2014) (second degree murder), 39-13-211 (2014 (voluntary manslaughter). For example, second degree murder requires a knowing mens rea, and voluntary manslaughter requires an intentional or knowing mens rea. *See id.* §§ 39-13-210 (a)(1), 39-13-211(a). Attempt to commit second degree murder and attempt to commit voluntary manslaughter require the defendant to act with the intent to produce a result, in this case the killing of the victim. *See id.* § 39-12-101 (a)(2). If the jury concluded the State failed to prove the required mental states for the greater offenses, it would have properly rendered not guilty verdicts to the offenses. Had the jury so concluded, it would have proceeded to consider the next-lesser offense, misdemeanor reckless endangerment. We do not view the jury's rejection of the greater offenses to signal, conclusively, its acceptance of the defense of self-defense.

The Defendant's argument attempts to deflect this court's focus from the proper inquiry by casting the jury's verdicts relative to attempted second degree murder and attempted voluntary manslaughter as being inconsistent with its verdict for reckless endangerment. The proper inquiry, however, is whether the evidence is sufficient to support the jury's verdict relative to the conviction offense. *Cf. State v. Wiggins*, 498 S.W.2d 92, 94 (Tenn. 1973) (holding that consistency between verdicts for separate counts of an indictment that arise from the same criminal transaction is not required and that the proper inquiry is whether the evidence is sufficient to support the conviction offense).

Alternatively, the jury could have concluded that the Defendant failed to use force in accord with the parameters of the self-defense statute. Subdivision (b)(1) of the self-defense statute provides that a person may respond to the use or threat of force "to the degree the person reasonably believes the force [used in response] is immediately necessary." *See* T.C.A. § 39-11-611(b)(1). As the statute states, the person using force in response to what he reasonably believes to be a threat of death or serious bodily injury is privileged to do so "when and to the degree" he reasonably believes that the use of force "is immediately necessary to protect against the other's use or attempted use of unlawful force." *See id.* Thus, an essential component of a self-defense theory pursuant to subsection (b)(1) is that the defendant must use only that degree of force which is reasonably necessary to protect himself from the other person's use of unlawful force. Subdivision (b)(2) of the self-defense statute permits a person to use force likely to cause death or serious bodily injury if certain requirements are met relative to the person's reasonable belief that he faces an imminent danger of death or serious bodily injury. *See id.* § 39-11-611(b)(2).

Relative to the sufficiency of the evidence to support the reckless endangerment conviction, the evidence viewed in the light most favorable to the State shows multiple means by which the jury might arrive at a guilty verdict. The first theory is that the Defendant was the first aggressor in the physical altercation. The evidence showed that the Defendant bore ill will toward the victim because of past business dealings. The Defendant was participating in an elaborate practical joke at the victim's expense on the night of the offense. When the victim approached the Defendant to tell the Defendant the victim knew about the joke, the Defendant chest-bumped the victim and agreed to go outside after the victim invited the Defendant outside in order for the victim to "kick [the Defendant's] a--." As they entered the restaurant's foyer, the Defendant took his pocketknife from his pocket and cut the victim's neck. The victim hit the Defendant with the victim's fists, and the Defendant continued thrusting the knife toward the victim, even

-17-

as the victim attempted to restrain the Defendant. The victim suffered four major slash wounds and bled profusely. Life-saving surgery was required.

Viewed in the light most favorable to the State, the evidence also supports an alternative conclusion that the victim was the first aggressor but that the Defendant responded to being hit by the victim's fist by using a knife to slash the victim's neck. Relative to a self-defense theory pursuant to subsection (b)(1), the evidence shows that the Defendant exceeded the scope of his privilege to use that degree of force which was immediately necessary to protect the Defendant from the unarmed victim's use of unlawful force. Thus, the State rebutted the Defendant's claim of self-defense by showing that the Defendant's use of a knife to cut the unarmed victim was not a reasonable use of force. Turning to subsection (b)(2) of the self-defense statute, the evidence shows that the Defendant did not think a fight would occur and believed the victim was going to "blow off steam" but that when the victim punched the Defendant on the way outside, the Defendant responded with deadly force by slashing the victim's neck. A rational jury could conclude that the Defendant did not have a reasonable belief he was in imminent danger of death or serious bodily injury, that the danger creating the belief was not real or honestly believed to be real, and that the belief of danger was not based upon reasonable grounds. *See id.* § 39-11-611(b)(2)(A)-(C).

The Defendant argues that no evidence shows his conduct met the legal definition of the reckless mens rea required for reckless endangerment. He argues that the only proof relative to his culpability showed that he acted intentionally in using the pocketknife to cut the victim. It is a well-settled principle of law, however, that the requirement of a reckless mental state for an offense is satisfied by proof of a more culpable mental state of knowing or intentional. *See, e.g., State v. Clark*, 452 S.W.3d 268, 296 (Tenn. 2014).

The evidence supports a conclusion that the Defendant engaged in conduct that was, at least, reckless and which placed the victim in imminent danger of death or serious bodily injury. As we have stated, the jury acted within its province if it reached its verdict by rejecting the Defendant's testimony that he merely acted to defend himself by reaching for and using his knife to injure the victim. Alternatively, the jury was likewise within its province if it reached its verdict by determining that the Defendant's use of a knife was an unreasonable response to the use or threatened use of unlawful force by the victim or that the Defendant's use of deadly force was not based upon reasonable beliefs. Upon appellate review, we may not reweigh the evidence, as questions of the credibility of witnesses and the weight and value of the evidence are the province of the jury as the trier of fact. *See Bland*, 958 S.W.2d at 659; *Sheffield*, 676 S.W.2d at 547.

We turn to the Defendant's argument that no one other than the victim was endangered by the Defendant's use of a knife. The Defendant claims that the jury's acceptance of his defense of self theory relative to the greater charges of which it acquitted him "results in the use of the knife being privileged as to [the victim]." Thereby, he argues, the jury acted improperly in convicting him of reckless endangerment as to the victim. Further, he argues, the State failed to show than anyone other than the victim was in danger of death or serious bodily injury due to the Defendant's conduct. As we explained previously, however, the jury's rejection of the greater offenses does not lead to the inevitable conclusion that the State failed to rebut the self-defense theory.

The evidence is sufficient to support the conviction. The Defendant is not entitled to relief on this basis.

## II

## Exclusion of Evidence

The Defendant contends that the trial court erred in its evidentiary rulings relative to a prior recorded statement Paige Brown gave to a police investigator. The Defendant argues that notwithstanding the court's admission as substantive evidence of Ms. Brown's preliminary hearing testimony, the court ruled erroneously that the recorded statement she gave to a police investigator was inadmissible as substantive evidence. The Defendant argues that the prior statement was admissible because it was inconsistent with Ms. Brown's trial testimony. The State contends that the court did not err in excluding the recorded statement as substantive evidence. The Defendant argues, alternatively, that Ms. Brown's statements were subject to the cancellation rule because they were diametrically opposed. The State responds that the cancellation rule is inapplicable because Ms. Brown's trial testimony was corroborated. We agree with the State in both respects.

## A. Trial Court's Ruling

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible unless it qualifies as an exception. *Id.* at 802.

Tennessee Rule of Evidence 613(b) provides a mechanism for impeachment of a witness with the witness's prior inconsistent statement. The rule states:

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded the opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admission of a party-opponent as defined in Rule 803(1.2).

Tenn. R. Evid. 613(b).

Further, a hearsay exception exists for admission of a witness's prior inconsistent statement as substantive evidence. Tennessee Rule of Evidence 803(26) creates a hearsay exception for:

> A statement otherwise admissible under Rule 613(b) if all of the following conditions are satisfied:
>
> (A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.
>
> (B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.
>
> (C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26).

A trial court's factual findings and credibility determinations relative to a hearsay issue are binding upon an appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The determination of whether the statement in question is hearsay and whether a hearsay exception applies are questions of law that are reviewed de novo. *Id.*

Ms. Brown testified at the trial that she saw the victim stop, turn, and hit the Defendant when the men were in the foyer. When asked when she first saw blood, she said it had been when the victim turned to swing at the Defendant. Ms. Brown's trial testimony was at odds with her prior statements and her prior preliminary hearing testimony. She acknowledged that she had not told the police in the video-recorded statement she gave a few days after the incident that she had first seen blood when the

victim turned to hit the Defendant and that she had seen a large amount of blood after the third or fourth punch. She acknowledged telling a defense investigator that the victim had punched the Defendant without provocation and that the men threw about three punches each before the Defendant took his hand from his pocket. Ms. Brown acknowledged that in her preliminary hearing testimony, she had said she did not see the Defendant do anything to the victim before the victim punched the Defendant and that the Defendant had walked with his left hand in his pocket and had his hand in his pocket when the victim threw the first punch.

The defense cross-examined Ms. Brown in considerable detail about her prior statements and prior testimony. She acknowledged her prior statements but described her trial testimony as being "as clear as I can possibly remember." She did not address, directly, the reason for differences between the pretrial statements and her trial testimony. The defense offered a transcript of Ms. Brown's preliminary hearing testimony as an exhibit to her testimony, and the court received it without objection. The defense sought to introduce Ms. Brown's video recorded statement pursuant to Tennessee Rule of Evidence 803(26) during cross-examination of Detective Kemp. The State argued that the evidence should not be admitted because extrinsic evidence of a witness's prior inconsistent statements was inadmissible when the witness unequivocally admitted that she made the prior statements. Initially, the trial court found that the prior recorded statement was trustworthy and ruled that the evidence was admissible. After the State requested reconsideration and submitted caselaw to the court, however, the court reversed its course. Upon further consideration, the court found that Ms. Brown did not deny having made the prior inconsistent statements, about which she had been cross-examined, and that she did not equivocate about having made them. The court also found that the Defendant's rights would not be prejudiced by exclusion of the extrinsic evidence such that the interests of justice would compel admission of the evidence. Thus, the court ruled that the witness's prior recorded statement was inadmissible.

The Defendant contends on appeal that the trial court erred by excluding the evidence of the prior recorded statement and that it should have been admitted pursuant to Tennessee Rule of Evidence 803(26). The Defendant argues that the court erred by affording disparate treatment to Ms. Brown's preliminary hearing testimony, which it admitted, and the prior recorded statement, which it excluded.

A central issue in this case was whether the Defendant or the victim was the first aggressor. Ms. Brown's prior recorded statement reflects that the fight began when the victim turned and hit the Defendant while the Defendant had his hand in his pocket, that Ms. Brown did not see blood when the victim turned to hit the Defendant, that the Defendant raised his hand in response to the victim's punch but that she had not seen

-21-

anything in the Defendant's hand, and that Ms. Brown saw blood after the third or fourth punch was thrown. She said in her trial testimony, however, that she saw blood when the victim turned to swing at the Defendant, suggesting that the Defendant had already cut the victim. Ms. Brown was impeached with evidence of her prior unsworn statements,[1] but her prior sworn testimony was admitted as substantive evidence. The question is whether the video recorded statement should have been admitted as substantive evidence.

Because evidence that is admitted pursuant to Rule 803(26) must be otherwise admissible pursuant to Rule 613(b), we begin with a review of the trial court's ruling relative to Rule 613(b). In order for extrinsic evidence of a prior statement to be admissible pursuant to Rule 613(b), the witness must be asked whether she made the statement and must deny or equivocate as to having made it. *See State v. Devonta Amar Cunningham*, No. M2012-02203-CCA-R3-CD, 2015 WL 173495, at \*12 (Tenn. Crim. App. Jan. 14, 2015), *perm. app. denied* (Tenn. May 14, 2015). However, "Extrinsic evidence of a prior inconsistent statement remains inadmissible when a witness unequivocally admits to having made the prior statement." *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998); *see State v. Foust*, 482 S.W.3d 20, 41 (Tenn. Crim. App. 2015); *State v. Colvett*, 481 S.W.3d 172, 200 (Tenn. Crim. App. 2014); *State v. Ackerman*, 397 S.W.3d 617, 638 (Tenn. Crim. App. 2012), *overruled on other grounds by State v. Sanders*, 452 S.W.3d 300, 306-311 (Tenn. 2014); *State v. Wyrick*, 62 S.W.3d 751, 788 (Tenn. Crim. App. 2001). As we have stated, Ms. Brown testified at the trial and was subject to cross-examination regarding her prior recorded statement and, specifically, her prior statements that she did not see blood when the victim turned to hit the Defendant, who had his hand in his pocket, that the Defendant raised his hand in response but that she did not see anything in it, and that she saw blood after the third or fourth punch. Ms. Brown acknowledged making the prior statements. Because she admitted making the statements, extrinsic evidence of them was inadmissible pursuant to Rule 613(b), making them likewise inadmissible pursuant to Rule 803(26). The trial court did not err in excluding the video recording of Ms. Brown's police interview.

In reaching this conclusion, we have not overlooked the Defendant's argument that Rule 803(26) abrogated Rule 613(b)'s principle of inadmissibility of extrinsic evidence of a prior inconsistent statement when the witness admits making the prior statement. However, as evidenced by the cases cited above, this court has continued to follow this settled principle of law, notwithstanding the advent of Rule 803(26). We are not compelled by the present case to depart from the established precedent of this court.

---

[1] As we have noted, Ms. Brown was impeached with various pretrial statements. The only statement the Defendant contends should have been admitted pursuant to Rule 803(26) is the video recorded statement she gave to the police a few days after the offense.

Regarding the Defendant's complaint that the trial court erred in admitting Ms. Brown's prior testimony, on the one hand, but excluding her prior recorded statement, on the other hand, we are unpersuaded by this general fairness argument. As we noted previously, the defense offered the transcript of Ms. Brown's preliminary hearing testimony as an exhibit after cross-examining her. The State did not object, and the court admitted the evidence. The State has not challenged, on appeal, the propriety of the trial court's ruling relative to the admission of the transcript of Ms. Brown's preliminary hearing testimony as substantive evidence. The Defendant, having received the benefit of the court's ruling regarding the admissibility of that evidence, cannot be heard to complain that he was entitled to the admission of similar evidence, notwithstanding its hearsay character and its inadmissibility pursuant to the Rules of Evidence.

The trial court did not abuse its discretion in ruling that Ms. Brown's prior recorded statement was inadmissible as substantive evidence. The Defendant is not entitled to relief on this basis.

## B. Cancellation Rule

The Defendant argues, alternatively, that Ms. Brown's statements are subject to the cancellation rule because they are diametrically opposed. The State responds that the cancellation rule is inapplicable when a witness's testimony is corroborated and that the victim's wife's testimony corroborated Ms. Brown's testimony that the Defendant cut the victim first and that the victim bled immediately.

"[C]ontradictory statements by a witness in connection with the same fact cancel each other." *State v. Matthews*, 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993); *see Taylor v. Nashville Banner Pub. Co.*, 573 S.W.2d 476, 482 (Tenn. Ct. App. 1978). The rule of cancellation comes into play "only when the inconsistency in a witness' testimony is unexplained and when neither version of [the] testimony is corroborated by other evidence." *Matthews*, 888 S.W.2d at 450 (citing *Taylor*, 573 S.W.2d at 483).

In the present case, Ms. Brown's trial testimony that she saw blood when the victim turned to hit the Defendant may be viewed as inconsistent with her preliminary hearing testimony, in which she did not mention this fact. Her testimony suggests that the Defendant was the aggressor, whereas in her preliminary hearing testimony, she said that she did not see the Defendant do anything to the victim before the victim hit the Defendant and that the Defendant had been walking with his left hand in his pocket when the victim hit the Defendant. However, Ms. Brown's trial testimony was corroborated by the victim's wife's testimony that as the victim and the Defendant walked to the entrance,

the victim's wife saw the Defendant's "shoulders and body go up . . . into" the victim's right side and that the victim's face and neck were cut. The Defendant argues that Ms. Brown was the only "non-interested party," suggesting that the victim's wife's testimony does not provide corroboration because she is an interested party. The Defendant's argument is flawed because he seeks to engraft a requirement to the cancellation rule for which he has provided no legal authority. The cancellation rule applies when neither version of a witness's testimony is corroborated by "other evidence." *Id.* The rule does not require that the evidence be from a "non-interested party." In the present case, the victim's wife's testimony was other evidence to corroborate Ms. Brown's trial testimony. The cancellation rule does not apply, and the Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE